Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/27/2016 08:07 AM CDT

David Robert Burcham, appellee, v.
Linda Jean Burcham, appellant.

___ N.W.2d ___

Filed September 27, 2016.   No. A-15-814.

1. **Divorce: Child Custody.** When custody of minor children is an issue in
   a proceeding to dissolve the marriage of the children's parents, custody
   is determined by parental fitness and the children's best interests.
2. **Child Custody.** When both parents are found to be fit, the inquiry for
   the court on the issue of custody is the best interests of the children.
3. **Parent and Child.** The best interests of a child require a parent-
   ing arrangement for a child's safety, emotional growth, health, stabil-
   ity, and physical care and regular and continuous school attendance
   and progress.
4. \_\_\_\_. The best interests of a child also require that the child's families
   and those serving in parenting roles remain appropriately active and
   involved in parenting with safe, appropriate, continuing quality contact
   between children and their families when they have shown the ability to
   act in the best interests of the child and have shared in the responsibili-
   ties of raising the child.
5. **Divorce: Child Custody: Public Policy.** It is sound public policy to
   keep children together when possible, but considerations of public
   policy do not, in all cases, prevent the splitting of the custody of the
   children when a marriage is dissolved; rather, the ultimate standard is
   the best interests of the children.
6. **Child Support.** The paramount concern and question in determining
   child support is the best interests of the child.
7. **Rules of the Supreme Court: Child Support: Presumptions.** In gen-
   eral, child support payments should be set according to the Nebraska
   Child Support Guidelines, adopted by the Nebraska Supreme Court,
   which are presumed to be in the best interests of the child.
8. **Child Support.** In calculating child support, the court must consider the
   total monthly income, defined as income of both parties derived from
   all sources.

9. **Child Support: Presumptions.** All income from employment must be included in the initial child support calculation, which then becomes a rebuttable presumption of appropriate support.

10. **Child Support.** Copies of at least 2 years' tax returns, financial statements, and current wage stubs should be furnished to the court for purposes of determining the parents' income in order to calculate child support.

11. ____. Income derived from farming is subject to fluctuations. The use of income averaging when dealing with farm income has been approved for purposes of calculating child support.

12. **Divorce: Appeal and Error.** In a de novo review of a judgment in marriage dissolution proceedings, when the evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

13. **Records: Appeal and Error.** It is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors.

14. **Appeal and Error.** Generally, a party cannot complain of error which the party has invited the court to commit.

15. **Divorce: Minors: Stipulations.** Parties in a proceeding to dissolve a marriage cannot control the disposition of matters pertaining to minor children by agreement.

16. **Parent and Child: Social Security.** Social Security benefits paid to children as a result of their parents' employment are not a mere gratuity from the federal government but have been earned through the parent's payment of Social Security taxes.

17. **Parent and Child: Child Support: Social Security.** A request to apply Social Security benefits received as a result of a parent's employment to the parent's child support obligation is merely a request to identify the source of payment, and a Social Security benefit can serve as a substitute source of income.

18. ____: ____: ____. Social Security benefits received on behalf of a parent's employment may be used to offset a portion of child support costs, but it is not appropriate to offset child support costs where the Social Security benefits are received due to the disability of the child and therefore intended to mitigate the additional costs accompanying disabilities.

19. ____: ____: ____. Social Security disability benefits paid on behalf of a parent's disability can be considered income to the parent for child support purposes, because the benefits are received in lieu of the parent's income.

20. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

21. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

22. \_\_\_\_: \_\_\_\_. Property which one party brings into the marriage is generally excluded from the marital estate.

23. **Divorce: Property Division: Proof.** The burden of proof to show that property is nonmarital remains with the person making the claim in a dissolution proceeding.

24. **Divorce: Property Division.** An exception to the general rule that property owned prior to the marriage is excluded from the marital estate exists where both of the spouses have contributed to the improvement or operation of the nonmarital property or where the spouse not owning the nonmarital property has significantly cared for the property during the marriage.

25. \_\_\_\_: \_\_\_\_. When applying the exception to the general rule regarding premarital property, evidence of the value of the contributions and evidence that the contributions were significant are generally required.

26. \_\_\_\_: \_\_\_\_. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.

27. \_\_\_\_: \_\_\_\_. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.

28. \_\_\_\_: \_\_\_\_. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse.

29. \_\_\_\_: \_\_\_\_. If the separate property remains segregated or is traceable into its product, commingling does not occur.

30. **Property Division: Proof.** The burden of proof rests with the party claiming that property is nonmarital.

31. **Property Division.** Marital debt is defined as a debt incurred during the marriage and before the date of separation, by either spouse or both spouses, for the joint benefit of the parties.

32. **Divorce: Attorney Fees: Appeal and Error.** In a dissolution of marriage case, an award of attorney fees is discretionary, is reviewed de

novo on the record, and will be affirmed in the absence of an abuse of discretion.

33. **Attorney Fees.** The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and general equities of the case.

34. **Divorce: Attorney Fees.** Attorney fees incurred by the parties during the pendency of dissolution proceedings do not constitute marital debt.

Appeal from the District Court for Dixon County: Paul J. Vaughan, Judge. Affirmed in part, and in part reversed and remanded with directions.

Alice S. Horneber, of Horneber Law Firm, P.C., for appellant.

Nancy R. Shannon, of Cordell Law, L.L.P., for appellee.

Inbody, Riedmann, and Bishop, Judges.

Riedmann, Judge.

## INTRODUCTION

Linda Jean Burcham appeals from the order of the Dixon County District Court which dissolved her marriage to David Robert Burcham, divided the marital property, awarded custody of the parties' minor children, and calculated child support. For the reasons explained below, we reverse the child support calculation and remand the cause with directions to the district court to recalculate child support excluding the adoption subsidy the parties receive on behalf of their adopted children. We otherwise affirm.

## BACKGROUND

Linda and David were married in 2001, and David filed for dissolution of the marriage in November 2013. During the marriage, the parties adopted three siblings: a daughter, H.B., born in 1997; and two sons, A.B., born in 1999, and Z.B., born in 2001. Initially during the dissolution proceedings,

the parties shared temporary joint legal and physical custody of the children, following a "week on, week off" schedule; however, in October 2014, the court modified the temporary order and placed physical custody of H.B. with Linda and physical custody of A.B. and Z.B. with David. Linda received parenting time with the boys every other weekend, and David received parenting time with H.B. on alternating weekends but only upon the agreement of Linda, David, and H.B.

When Linda and David first married, they lived in a house David owned prior to the marriage. In 2003, they built the marital residence, located in Newcastle, Nebraska, on 45 acres of land that David had purchased in 1996. David worked at a telephone company throughout the marriage and earned additional income from farming. Linda worked full time during the marriage until reducing her schedule to 80 percent after the children were adopted. During that time, she was primarily responsible for the care of the children. After nearly 8 years, she resumed full-time employment.

All three of the children have special needs. H.B.'s mental health presented the greatest challenge for Linda and David. H.B. was admitted to a mental health facility on two occasions in 2012; the first stay was for 2 weeks and the second stay was for 6 weeks. She was admitted again in March 2013 after cutting herself with a knife. In September 2014, H.B. attempted suicide by overdosing on various pills. Linda took H.B. to the emergency room, and she was admitted to the mental health facility where she remained for 6 to 8 weeks.

Linda testified at trial that she never had any concerns that H.B. would harm A.B. or Z.B., but she acknowledged that an admission report from the mental health facility dated March 5, 2013, indicated that Linda reported finding a graphic drawing H.B. made depicting her assaulting her brothers, that Linda expressed concern about the disappearance of two family cats, that Linda and David expressed concern about H.B.'s safety upon returning home and the safety of other family members, and that Linda reported that

H.B. appears to want to hurt the ones who love her the most. At trial, David testified that he does have concerns about the boys' safety around H.B.

The evidence also established that the Department of Health and Human Services substantiated a report of David's physically abusing H.B. in October 2013. H.B. was observed with a bruise on her face from being "smacked" by David after an argument. Although David was allowed visits with H.B. during the pendency of the dissolution proceedings, H.B. had not spent any nights with David after December 2013, and David did not communicate to Linda a desire to spend any time with H.B. Throughout the case, H.B. continued to attend therapy sessions with a counselor and began seeing a psychiatrist at the end of 2014. According to Linda, H.B. responded very well to new medications, and she noticed a significant improvement in H.B.'s depression.

A.B., who was 15 years old at the time of trial, has been diagnosed with mild mental retardation and has "IEPs at school." He also has a hearing delay. Nevertheless, he participates in football, basketball, and track and is involved in 4-H activities. David described A.B. as "a very happy-go-lucky kid" and acknowledged that he will always need some kind of assistance and guidance. He also said that A.B. is his "right-hand man" and wants to help David with everything. A.B. testified that he enjoys living with David because that way they get to spend more time together. He would like to continue living with David and seeing Linda on the weekends but said that he would like to see H.B. more often. He said that he, H.B., and Z.B. get along well and have a good time together.

Z.B. was 13 years old at the time of trial. He has been diagnosed with "ADHD" and has "IEPs" at school as well. Nevertheless, like A.B., he also participates in football, basketball, and track at school and is involved in 4-H activities. He testified that he enjoys living with David because he can stay in one place instead of moving around so much.

Because of the children's special needs, the parties receive an adoption subsidy of $1,300 per month from the State of Kansas, the state from which the children were adopted. Linda requested that the court return to the joint physical custody arrangement it initially ordered utilizing the week on, week off schedule. She believed it was important for the children to remain together because she and David adopted them as a sibling group so they should remain a sibling group. David testified, however, that he did not believe Linda and he could communicate well enough to share joint physical custody. He believed that splitting the children up was in their best interests because the boys were thriving and comfortable living with him and because there are issues with H.B. that place the boys at risk. He did not believe sharing custody of the boys worked well for them, and now that they have more structure and stability, their grades and behavior have improved.

The district court entered the decree dissolving Linda and David's marriage on August 5, 2015. The court found it was in the best interests of the children that David have legal custody and primary physical custody of A.B. and Z.B. and that Linda have legal custody and primary physical custody of H.B. Linda was awarded visitation with the boys every other weekend.

Linda was also ordered to pay $379 per month in child support for three children, $790 per month for two children, and $588 per month for one child. In calculating the parties' incomes for child support purposes, the court utilized the parties' incomes from their employment and added $200 per month in farming income for David. The court also assigned the adoption subsidy to the parent with custody of the child, meaning David received the subsidy for the boys and Linda received the subsidy for H.B.

The court valued and divided the parties' property utilizing their joint property statement. Ultimately, Linda was ordered to make an equalization payment of $16,829 to David in monthly installments of $500. Greater details regarding the

court's classification, valuation, and division of property will be provided in the analysis section below as needed to address Linda's arguments on appeal. Each party was ordered to pay his or her own attorney fees. Linda has now appealed to this court.

## ASSIGNMENTS OF ERROR

Linda assigns that the district court erred in (1) its award of custody and visitation of A.B. and Z.B.; (2) its award of child support and dependency exemptions; (3) its division of property, award of the equalization payment, and division of responsibility for outstanding obligations; and (4) its allocation of attorney fees.

## STANDARD OF REVIEW

An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, and alimony. *Id*.

In a dissolution of marriage case, an award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000).

## ANALYSIS

*Custody and Visitation.*

Linda argues that the district court erred in awarding custody of A.B. and Z.B. to David. We find no abuse of discretion in the custody order.

[1,2] When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests. See, *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d

444 (2009); Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2014). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Maska v. Maska, supra*. Because the district court found that Linda and David were both fit parents, a finding that Linda does not challenge, we consider the children's best interests.

[3,4] The best interests of a child require a parenting arrangement "for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress." Neb. Rev. Stat. § 43-2923(1) (Cum. Supp. 2014). The best interests of a child also require that

> the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.

§ 43-2923(3). Section 43-2923(6) further provides:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member[;] and
>
> (e) Credible evidence of child abuse or neglect or domestic partner abuse.

[5] Both parties submitted evidence at trial regarding custody of A.B. and Z.B. Custody of H.B. was not at issue; the parties agreed that it was in her best interests to reside with Linda. Linda claimed that awarding her custody was in the boys' best interests because she had always been their primary caregiver and it would allow them to maintain their close relationship with H.B. Although the Supreme Court has acknowledged that it is sound public policy to keep children together when possible, considerations of public policy do not, in all cases, prevent the splitting of the custody of the children when a marriage is dissolved; rather, the ultimate standard is the best interests of the children. *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990).

We understand Linda's desire to keep all three siblings together, particularly her plea at trial that because she and David adopted the children as a sibling group, they deserve to remain a sibling group. We appreciate the district court's concern regarding the safety of the boys due to concerns about H.B.'s mental health but also consider Linda's testimony that H.B.'s medication has resulted in significant improvement in her depression symptoms. We also recognize the evidence at trial establishing that the children are close to one another and "bicker" as normal siblings do, and A.B.'s testimony that seeing H.B. every other weekend was not enough time and that he wished he had more contact with his sister.

Although separating the children may not be the ideal situation, ultimately the record supports the conclusion that it is in the boys' best interests to be placed with David. Both boys testified that they did not like the week on, week off joint custody arrangement and liked living with David. They indicated they enjoyed living at the marital residence because of the animals and the farming activities they did with David. David opined that the joint custody arrangement did not work for the boys; however, they were thriving and comfortable living with him, and their behavior and grades had improved as a result of having more structure and stability. Based on

the record before us, we cannot find that the district court abused its discretion in awarding custody of A.B. and Z.B. to David.

In the alternative, Linda argues that the district court should have awarded joint legal and physical custody of A.B. and Z.B., returning to the alternating weekly schedule. As explained above, both boys indicated a desire to primarily reside with David, and David testified that allowing the boys to have a primary residence worked better for them and has improved their behavior and grades. We therefore find no abuse of discretion in the parenting time schedule.

*Child Support Calculation.*

Linda asserts that the district court erred in its calculation of child support in two respects. First, she claims that the court's calculation of David's income is incorrect because the court should have utilized the parties' 2012 joint tax return to determine the income he earns from farming. In addition, Linda argues that the court improperly treated the adoption subsidy as income rather than using it to offset any child support obligation owed. We find no abuse of discretion in the calculation of David's farming income. However, although we do not agree that the amount of child support owed should be offset by the adoption subsidy, we agree with Linda that the court's treatment of the subsidy as income was error.

[6,7] The paramount concern and question in determining child support is the best interests of the child. See *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines, adopted by the Nebraska Supreme Court, which are presumed to be in the best interests of the child. See *id.*

[8,9] In calculating child support, the court must consider the total monthly income, defined as income of both parties derived from all sources. Neb. Ct. R. § 4-204 (rev. 2016). Thus, all income from employment must be included in the

initial calculation, which then becomes a rebuttable presumption of appropriate support. *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001).

In the present case, the district court calculated David's monthly income by utilizing the income he earns from the telephone company and adding $200 for farming income. Linda claims that David's farming income should have been established using the parties' 2012 joint tax return, which indicated the yearly farming income was $19,388.

[10,11] The Nebraska Child Support Guidelines provide that copies of at least 2 years' tax returns, financial statements, and current wage stubs should be furnished to the court for purposes of determining the parents' income in order to calculate child support. § 4-204. Nebraska courts have recognized that income derived from farming is subject to fluctuations. See, *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007); *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012); *Willcock v. Willcock*, 12 Neb. App. 422, 675 N.W.2d 721 (2004). Thus, the use of income averaging when dealing with farm income has been approved for purposes of calculating child support. Specifically, the Nebraska Child Support Guidelines provide that in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent contribution of each parent. See Neb. Ct. R. ch. 4, art. 2, worksheet 1, fn.5 (rev. 2015). In *Gress v. Gress, supra*, the Supreme Court discussed at length the number of years that a court should use when averaging income pursuant to the Nebraska Child Support Guidelines and concluded that a 3-year average tended to be the most common approach in cases where a parent's income fluctuates.

In the present case, however, the only evidence provided to establish David's farming income was the 2012 tax return. Linda testified that their farming income fluctuated and that some years it was higher than the earnings in 2012. The district court made a factual finding that the income David earned in

2012 from farming did not accurately represent a "typical" year and, therefore, did not utilize that figure to calculate David's total monthly income.

[12,13] In our de novo review of a judgment in marriage dissolution proceedings, when the evidence is in conflict, we consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Catlett v. Catlett*, 23 Neb. App. 136, 869 N.W.2d 368 (2015). Thus, we give weight to the fact that the district court found the 2012 tax return was not an accurate representation of David's farming income. Unfortunately, while there is no dispute that David earns some amount of income from farming, the parties failed to elicit any testimony which would allow the district court, and this court, to determine an appropriate or average income. Moreover, Linda did not request all exhibits offered and received at trial in her praecipe for the bill of exceptions; therefore, the record on appeal does not contain all of the exhibits received into evidence at trial. We are unable to determine whether any exhibits offered and received at trial would support Linda's argument that the court should have used a higher farming income. As a result of her failure to present a record which would support her argument, we can find no abuse of discretion. As a general proposition, it is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors. *Centurion Stone of Neb. v. Whelan*, 286 Neb. 150, 835 N.W.2d 62 (2013). We therefore cannot find that the district court abused its discretion in setting David's farm income at $200 per month.

[14,15] Linda also asserts that the district court erred in considering the adoption subsidy as income for purposes of calculating child support. She argues that the subsidy is similar in nature to the payment of a Social Security benefit and that therefore, it should be considered an offset to any child support owed. At the outset, we recognize that although Linda now

claims the district court's inclusion of the adoption subsidy as income was error, the proposed child support worksheet she submitted to the court at trial also treated the subsidy as income. Generally, a party cannot complain of error which the party has invited the court to commit. *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013). However, parties in a proceeding to dissolve a marriage cannot control the disposition of matters pertaining to minor children by agreement, *id.*, because the paramount concern and question in determining child support is the best interests of the child, see *id*. We therefore address this argument in order to determine whether the child support ordered is consistent with the best interests of the children.

The issue of how adoption subsidies should be treated with regard to an award of child support is one of first impression in this jurisdiction. Linda relies on *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015), to support her argument in favor of offsetting any child support obligation by the amount of the subsidy. Her reliance on *Johnson* is misplaced, however. The children in *Johnson* received Social Security disability payments as a result of their father's status as a retired taxpayer, and the issue on appeal was whether the father should have been given credit against his child support obligation for the Social Security benefits which were paid to his children. The appeal was taken from a modification action, and the benefits had not been disclosed to the court at the time of the divorce proceedings. Therefore, the Supreme Court affirmed the trial court's treatment of the Social Security payments as a gratuity and declined to give the father child support credit for the benefits paid to his children.

This court has also addressed the treatment of Social Security benefits. See *Ward v. Ward*, 7 Neb. App. 821, 585 N.W.2d 551 (1998). In *Ward*, a child began receiving Social Security benefits after her mother passed away. The child's father remarried, and his second wife adopted the child. When the father and his second wife divorced, at issue was whether the Social Security

payments should offset some of the money each parent owed in child support. We held that the benefits should offset child support and reduced the amount of each parent's obligation by a proportion of the Social Security payment equal to that parent's share of the child support needs.

[16,17] In *Johnson* and *Ward*, the children were receiving Social Security benefits as a result of their parents' employment. The Supreme Court in *Johnson* observed that Social Security benefits in those instances are not a mere gratuity from the federal government but have been earned through the parent's payment of Social Security taxes. The Supreme Court reiterated that a request to apply Social Security benefits to a child support obligation in those circumstances is merely a request to identify the source of payment, and a Social Security benefit can serve as a substitute source of income. See *Johnson v. Johnson, supra*.

The Supreme Court reached a different conclusion, however, in *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). There, the parties' youngest child received Social Security benefits as a result of having Down syndrome. When calculating the father's child support obligation, the trial court disregarded the Social Security benefits, and the father challenged that decision on appeal. In support of his argument that his child support obligation should be reduced in light of the Social Security benefits, the father cited to *Ward v. Ward, supra*. The Supreme Court found *Ward* distinguishable in part because of the basis for the Social Security benefits, stating:

> [I]t is well established that children with actual disabilities like Down syndrome have special needs above and beyond the needs of most children. All children have support needs, but special-needs children require additional financial support to overcome developmental, cognitive, or physiological problems. With this in mind, the federal government provides Social Security to such children with the intent that it will "supplement other income, not substitute for it." In contrast, the money allocated to

the youngest child under the [Nebraska Child Support
Guidelines] is meant to provide for the basic needs all
children have. To construe one source of money as sat-
isfying both needs would leave either his basic or his
special needs unfulfilled.

*Gress v. Gress*, 274 Neb. at 700, 743 N.W.2d at 79.

[18] The *Gress* court also recognized that unlike a child
with a disability, a child who loses a parent at a young age
does not necessarily have special needs that will lead to
increased support costs, and in that context, Social Security
benefits are intended to account for the fact that the child has
lost a source of support for his or her basic needs. The court
found that using Social Security benefits to offset a portion
of child support costs is not necessarily a problem under the
circumstances presented by *Ward*, but it was not appropriate
to offset child support costs where, as in *Gress*, the Social
Security benefits are intended to mitigate the additional costs
that accompany disabilities. The *Gress* court therefore held
that the district court did not abuse its discretion when it disre-
garded the Social Security benefits for purposes of calculating
child support.

Stated another way, Social Security benefits paid to a child
as a result of the disability or death of a parent are distinguish-
able from those benefits paid as a result of the child's disabil-
ity. Social Security benefits may be used to offset a parent's
payment of child support under the Nebraska Child Support
Guidelines to provide for the child's basic needs, because the
benefits are intended to replace the parent's income source.
However, Social Security benefits may not be used to offset a
child support obligation for a child with special needs, because
the benefits are intended to supplement the parent's income
and mitigate the increased costs associated with supporting a
special needs child.

The question of whether the adoption subsidy in the present
case should offset Linda's child support obligation is resolved
by determining whether the subsidy constitutes a substitute for

an income source or whether it is intended as a supplement to income. Courts in other jurisdictions have concluded that the purpose of an adoption subsidy is to serve as a supplement to income, not as a replacement for a parent's income, and that those payments therefore do not offset or otherwise serve as a credit against a parent's child support obligation. See, *In re Marriage of Thomas*, 49 Kan. App. 2d 952, 318 P.3d 672 (2014); *W.R. v. C.R.*, 75 So. 3d 159 (Ala. Civ. App. 2011); *Gambill v. Gambill*, 137 P.3d 685 (Okla. Civ. App. 2006); *In re Marriage of Bolding-Roberts*, 113 P.3d 1265 (Colo. App. 2005); *Strandberg v. Strandberg*, 664 N.W.2d 887 (Minn. App. 2003); *Hamblen v. Hamblen*, 203 Ariz. 342, 54 P.3d 371 (Ariz. App. 2002).

In the instant case, the children receive the adoption subsidy because of their special needs. Thus, the subsidy is not intended to replace a source of income in order to provide for the children's basic needs; rather, it is provided to alleviate the additional costs of the children's special needs. As the Arizona Court of Appeals observed in *Hamblen v. Hamblen, supra*, it would be inappropriate to adjust a child's entitlement to financial support because the government has elected to subsidize the increased financial commitment that a special needs child imposes on the parents. The court further observed that the subsidy is but an addition to a parent's obligation of financial support and that if it were credited against the parent's child support obligation, it would, in effect, eliminate the supplementary effect of the subsidy. Accordingly, Linda's child support obligation should not be offset by the amount of the adoption subsidy.

We recognize, as David argues, that the Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, the court must consider the total monthly income, defined as the income of both parties derived from all sources, except all means-tested public assistance benefits. See § 4-204. However, we do not agree that the adoption subsidy is considered income of the parents.

[19] Social Security disability benefits paid to a mother and her child as a result of the mother's disability have been included in the mother's income calculation because, as recognized above, such Social Security benefits are received in lieu of the parent's income. See *Hartman v. Hartman*, 261 Neb. 359, 622 N.W.2d 871 (2001). Other jurisdictions have determined, however, that adoption subsidies should not be included in the calculation of the parents' income for child support purposes because the subsidy is not income to the parent, rather it belongs to the child. See, *Strandberg v. Strandberg, supra*; *Hamblen v. Hamblen, supra*; *County of Ramsey v. Wilson*, 526 N.W.2d 384 (Minn. App. 1995); *A.E. v. J.I.E.*, 179 Misc. 2d 663, 686 N.Y.S.2d 613 (N.Y. Sup. 1999). In *Hamblen*, the Arizona Court of Appeals observed that "the United States Department of Health and Human Services explicitly states in its Child Welfare Policy Manual" that "'[f]oster and adoptive parents are not recipients of Federal foster care and adoption assistance payments; rather, foster care and adoption assistance payments are made on the child's behalf to meet his or her needs.'" 203 Ariz. at 345, 54 P.3d at 374.

As a result, we find that the district court erred in treating the adoption subsidy as income for the purposes of calculating child support. We also reject Linda's assertion that she is entitled to an offset of the child support obligation she owes to David, because the adoption subsidies are intended to assist Linda and David with the increased costs associated with raising children with special needs above and beyond the amount of basic support contemplated by the Nebraska Child Support Guidelines. We therefore reverse the child support calculation and remand the cause with directions to the district court to recalculate child support excluding the adoption subsidy. Based on our affirmance of the custody award, David is entitled to the adoption subsidy for A.B. and Z.B., and Linda is entitled to the subsidy for H.B.

[20] Linda also assigns error with respect to the dependency exemptions the district court awarded, but she does not argue

this error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 868 N.W.2d 334 (2015). We therefore do not address this argument.

*Property Division.*

Linda assigns error with respect to various aspects of the district court's classification, valuation, and division of the parties' property. We address her arguments individually below.

[21] Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Plog v. Plog*, 20 Neb. App. 383, 824 N.W.2d 749 (2012).

[22,23] Linda first challenges the division of three retirement accounts she claims were her premarital property. The accounts are individually identified on the joint property statement. Property which one party brings into the marriage is generally excluded from the marital estate. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). The burden of proof to show that property is nonmarital remains with the person making the claim in a dissolution proceeding. *Id*.

Linda testified that the accounts were established prior to the marriage and contained premarital funds. There was no evidence presented, however, as to whether she contributed any funds to the accounts during the marriage. Thus, we are unable to discern whether the balances of the accounts as of the time the parties separated contained only premarital funds or a combination of marital and premarital funds. The district court apparently faced the same difficulty, stating in the decree that because neither party made any clear record regarding

the premarital values of the retirement accounts, it divided the accounts equally between the parties. Therefore, Linda has not met her burden of proving the funds are nonmarital, and we find no merit to this argument.

Linda next challenges the district court's decision to give David a credit of $21,000 for proceeds from the sale of his premarital home. She claims there was no evidence that he used any of those proceeds toward the marital home, and even if there were, she contributed to increasing the value of David's premarital home.

The parties lived in David's premarital home for the first few years of their marriage. Linda testified that during that time, they made minor repairs to the home such as painting, fixing a stairwell, repairing some plaster, and replacing some carpet. Linda was asked whether her assistance in improving the property had anything to do with the sale price of the home when it was sold, and she indicated that it did. The home was sold for $37,000 in 2003, and David testified that $21,000 of the proceeds from the sale went directly into the marital residence. Thus, we disagree with Linda's contention that there was no evidence presented to establish that any of the proceeds from the sale were put toward the marital residence.

[24] In the alternative, Linda argues that the court should have applied the exception to the general principle set out in *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982). The *Van Newkirk* exception applies where both of the spouses have contributed to the improvement or operation of nonmarital property or where the spouse not owning the nonmarital property has significantly cared for the property during the marriage. See *Van Newkirk v. Van Newkirk, supra*.

[25] When applying the *Van Newkirk* exception, evidence of the value of the contributions and evidence that the contributions were significant are generally required. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). In *Tyler*, the wife brought a home from a prior marriage into the marriage. The husband and the wife lived in the wife's house, sold it,

and purchased another, and then another, and finally a fourth home which became the focus of the appeal. This court, in a memorandum opinion, modified the divorce decree to require the wife to pay the husband half of the equity in the final home owned by the parties, and the Supreme Court reversed. The *Tyler* court said that each time the *Van Newkirk* exception had been applied, the Supreme Court "has required evidence of the value of the contributions and evidence that the contributions were significant." 253 Neb. at 213, 570 N.W.2d at 320. The court in *Tyler* then recited an extensive list of items which the evidence suggested the husband did to the home to improve it, such as building a deck, carpeting and painting the family room, replacing kitchen countertops, and installing four ceiling fans. However, the *Tyler* court observed that the husband failed to produce any evidence indicating the value of these contributions and that he failed to demonstrate "the significance of the aforementioned contributions." 253 Neb. at 214, 570 N.W.2d at 320.

In the present case, based on our de novo review of the record, we find that Linda failed to establish the monetary value of her contributions to the home and demonstrate that her contributions were significant. Even if Linda's work improved the home's value, she failed to attribute the increase in value to substantial contributions she made because she did not do the work alone. Accordingly, we conclude that the district court did not abuse its discretion in awarding David a $21,000 credit for his premarital property.

Linda next asserts that the district court erred in failing to classify livestock included on the joint property statement as a marital asset. The joint property statement lists eight feeder calves and eight pairs of cows and calves; David indicated that neither he nor Linda was the owner of the cows, whereas Linda assigned a total value to them of $28,800. At trial, David's mother was asked about the cows and calves listed on the property statement, and she testified that she and her husband owned them as of November 2013. David confirmed

his mother's testimony that his parents owned that particular livestock.

Linda notes that the parties claimed five stock cows on their 2012 joint tax return; through October 2012, she and David insured $14,000 worth of stock cows; and as of June 2013, they insured six head of stock cows and six head of stock calves. Thus, she argues, they clearly have cattle as marital assets, and the court should have entered a value of $28,800 and assigned the value to David.

We understand Linda's argument that at least as late as June 2013, the parties themselves acknowledged through their insurance policy that they owned cattle. However, there was no evidence offered at trial that as of the date of separation, the cows and calves listed on the property statement belonged to Linda and David, particularly when the only testimony at trial was from David and his mother that the parties were not the owners of the livestock listed on the property statement. We therefore cannot find that the district court abused its discretion in failing to classify the livestock as a marital asset.

Next, Linda contends that the district court erred in classifying and valuing a savings account held at a credit union. The court placed a value of $7,850 on the account, classified it as a marital asset, and awarded it to Linda. Linda claims the account was her premarital property and had a balance of only "$0.07" at the time of separation. Brief for appellant at 34. She asserts that "David's own Exhibit 52 confirms that the account [should be] valued at $0.07." *Id.* However, exhibit 52 is not contained in our record on appeal, so we are unable to verify Linda's claim. We also note that David testified that the first date of business for the account was in January 2013, testimony which appears to refute Linda's claim that she owned the account prior to the marriage. Further, on the parties' joint property statement David placed a value of $7,850 on the savings account, a value which was accepted by the district court. Again, we reiterate that it is Linda's burden, as the appellant, to supply a record that supports her

assignments of error. See *Centurion Stone of Neb. v. Whelan*, 286 Neb. 150, 835 N.W.2d 62 (2013). Because of her decision to request only certain exhibits in her praecipe for the bill of exceptions, we cannot find on the record before us that the district court's valuation and classification of the account was an abuse of discretion.

Finally, Linda asserts two claims with respect to the marital residence. She first argues that the court's valuation of the property was erroneous. The district court accepted David's value of $129,980 for the home and found that David was entitled to a credit of $21,000 for his premarital contribution; thus, the court's final valuation of the residence was $108,980. Linda claims the correct value was $330,000, a sum which includes the residence, the 45 acres of land upon which the home sits, and the other structures on the land. The court, however, determined that the 45 acres of land was David's premarital property because he purchased it prior to the marriage. Thus, the question is whether the district court properly classified the 45 acres of land as premarital property or whether the true value of the marital residence should include the value of the land as well.

[26-30] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id*. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id*. If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id*.

The parties agree that David purchased the land in 1996, which was prior to the marriage, and the land retained its

original form when the parties separated. David secured a loan to fund the purchase and continued to make payments on the loan until 2003. David testified that he applied $16,000 of proceeds from the sale of his premarital residence to pay off the loan on the land. To the contrary, Linda testified that the remaining balance on the loan was wrapped into the mortgage they secured on the marital residence. The trial court apparently found David's testimony more credible than Linda's, a finding to which we afford weight in our de novo review. See *Catlett v. Catlett*, 23 Neb. App. 136, 869 N.W.2d 368 (2015). Thus, David met his burden of proving the property was nonmarital.

There is some evidence establishing that David used marital funds between 2001 and 2003 to make the loan payments for the land. However, there was no evidence as to the amount of money used, and therefore, we cannot find that the district court abused its discretion in classifying the 45 acres of land as David's premarital property. Accordingly, the proper value of the marital residence includes the home only, and not the land upon which it sits.

Linda also claims that the court erred in dividing the residence's unpaid property taxes from 2012 and 2013 equally between the parties. She argues that as of December 10, 2013, the parties stipulated that David have "exclusive use" of the marital residence, and thus, he was obligated to pay the costs associated with maintaining the residence. Brief for appellant at 36. Despite Linda's claim, the temporary stipulation signed by the parties provided that Linda receive exclusive use of the parties' residence from December 9, 2013, at 7 p.m. until April 1, 2014, or such time she notified David otherwise. The evidence reveals, however, that Linda chose not to reside there after being granted exclusive possession due to safety concerns.

[31] Regardless, the property taxes for 2012 and 2013 were incurred during the marriage, and Linda resided in the house during 2012 and the majority of 2013. Marital debt is

defined as a debt incurred during the marriage and before the date of separation, by either spouse or both spouses, for the joint benefit of the parties. *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012). The parties remained together and lived jointly in the home until separating in the fall of 2013. Accordingly, we find no abuse of discretion in the court's treatment of the tax obligation as a marital debt and dividing it equally between the parties.

Finally, Linda asks that we order the marital residence to be sold and the proceeds split between the parties. We decline to do so. The district court properly classified the residence as marital property and awarded it to David. We have rejected all of Linda's arguments as to the court's division of property either because we find the district court's decision was not an abuse of discretion or because she failed to produce a record sufficient for our review to support her arguments. Accordingly, we affirm the classification, valuation, and division of property, including the equalization payment, in its entirety.

*Attorney Fees.*

[32,33] Linda argues that the district court erred in failing to award her attorney fees. In a dissolution of marriage case, an award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000). The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and general equities of the case. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008).

[34] Linda requested that her attorney fees of $20,000 be considered a marital liability and considered as a reduction in the amount of net marital assets awarded to her. As noted

above, a marital debt is one incurred during the marriage and before the date of separation for the joint benefit of the parties. See *Finley-Swanson v. Swanson, supra*. In *Finley-Swanson*, we held that the attorney fees incurred by the parties during the pendency of the dissolution proceedings did not constitute a marital debt because they were incurred after the parties were estranged and the wife filed the complaint for dissolution of marriage and that thus, they were clearly not for the parties' joint benefit.

The same is true in the present case. The attorney fees Linda owes were incurred after she and David had separated and were not for their joint benefit. Therefore, they were properly treated as Linda's separate obligation.

In our de novo review, we have considered the general equities of the case as well as the other relevant factors. This case involved multiple contested issues, including custody of A.B. and Z.B., child support, alimony, and property division. Linda asserts that she incurred additional fees as a direct result of David's actions, but the district court found, and we agree, that it appears "both of the parties litigated the issues with a high degree of contentiousness." We therefore find no abuse of discretion in denying Linda's request for attorney fees and ordering each party to pay its respective fees.

## CONCLUSION

We conclude that the district court erred in treating the adoption subsidy as income for the purposes of calculating child support. We therefore reverse that portion of the decree and remand the cause with directions to the district court to recalculate child support without considering the adoption subsidy. The decree is otherwise affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.